**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-CR-20552-Damian/Torres**

**UNITED STATES OF AMERICA**

**vs.**

**DAVID RIVERA and**
**ESTHER NUHFER,**

    **Defendants.**
_____/

**GOVERNMENT'S OMNIBUS MOTION *IN LIMINE***

## PRELIMINARY STATEMENT

The government respectfully moves *in limine* for the Court to:

1. Find statements of participants in the FARA scheme to be admissible under Rule 801(d)(2).

2. Find that the online news articles that the FARA-scheme participants cited in their written communications are non-hearsay under the circumstances of this case.

3. Admit certified domestic records and records generated by an electronic process or system pursuant to Fed. R. Evid. 803(6), 902(11) and 902(13).

4. Admit Rivera's deposition testimony in the civil action between Interamerican Consulting, Inc. ("Interamerican") and PDV USA, Inc. ("PDV USA") in the Southern District of New York ("SDNY").

5. Admit summaries of voluminous materials as evidence pursuant to Fed. R. Evid. 1006.

6. Permit the government to ask hypothetical questions in inquiring whether its witnesses (including government officials) would have interacted with the defendants regarding Venezuela matters had they known that defendants were being compensated by the Venezuelan state oil company and its U.S. affiliates pursuant to an agreement approved by senior Venezuelan officials.

7. Preclude the defendants from introducing self-serving out-of-court statements.

8. Preclude the introduction into evidence of law enforcement interview reports.

9. Preclude defendants from offering evidence or argument about recent changes in the Justice Department's FARA enforcement priorities.

10. Preclude defendants from offering evidence or arguing that this prosecution is unwarranted due to the government's unfair or selective enforcement of FARA.

11. Preclude defendants from offering evidence for which they did not make the proper disclosures by rule, including expert testimony.

12. Exclude evidence and argument relating to a public-authority defense.

13. Preclude defendants from offering evidence or argument that their actions were in conformance with U.S. foreign policy.

## Background

The superseding indictment charges defendants Rivera and Nuhfer with violating the

Foreign Agents Registration Act ("FARA"), engaging in transactions in criminally derived

property, and conspiring to do the same.  ECF 122 (Counts 1–8).  The charges are based on defendants' participation in a scheme to engage in unregistered political activities in the United States on behalf of the Venezuelan government, and to covertly represent that government's interests before U.S. officials, in order to influence U.S. foreign policy and garner support for the normalization of U.S-Venezuela relations.   As compensation for these efforts, senior officials of the Maduro government (including then-Venezuelan Foreign Minister Delcy Rodriguez) directed executives with Citgo Petroleum Corporation ("Citgo"), a wholly owned U.S. subsidiary of Petróleos de Venezuela, S.A. ("PdVSA"), the Venezuelan state oil company, to enter into a purported consulting agreement with Rivera's company Interamerican Consulting, Inc. ("Interamerican").  The signed agreement (dated March 21, 2017) between Interamerican and PDV USA, Inc., a non-operating U.S. subsidiary of PdVSA that was used from time to time by Citgo executives to execute directives from PdVSA and the Venezuelan government, provided that PDV USA would pay Interamerican a total of $50 million through a series of payments over the course of three months.   Interamerican ultimately received $20 million in connection with the PDV USA agreement, via four $5 million wire transfers in 2017.   Those funds, in pertinent part, were divided in roughly equal shares between Rivera, Nuhfer, Hugo Perera ("Individual 1"), and Raul Gorrin ("Foreign Individual 1"), through transfers to the accounts of their affiliated companies.  *See* ECF 122 pp. 13–14, 17, 25.[1]

As reflected in the indictment, the above-referenced participants in the FARA scheme communicated extensively in writing with each other (and with other persons) regarding the activities underlying the charged FARA and money-laundering counts.   Those communications

---

[1] Gorrin, a Venezuelan national and owner of a major Venezuelan media company, was a primary conduit between senior Maduro officials and the defendants with respect to the FARA scheme.

included encrypted text messages (recovered from sources including a court-authorized search of Rivera's iPhone) exchanged within the "MIA Chat Group," ECF 122 p.11, comprised of Rivera, Nuhfer, Perera, and Gorrin, as well as other text-message threads involving a subset of those persons.  *E.g.*, ECF 122 p.19 ¶ 44 (describing how Nuhfer texted Rivera and Perera, "We should not have to return a penny"); *id.* p.22 ¶ 62 (describing how Nuhfer texted Rivera, "No more mtgs until we get a slice").   The relevant communications also include a substantial number of emails, obtained via search warrants for Rivera's email accounts and from other sources, which similarly contain statements of the defendants and the FARA scheme's other participants regarding their unregistered political activities in order to obtain compensation through PdVSA.  *E.g.*, ECF 122 p. 12 ¶¶ 4–7 (citing emails between Rivera and Nuhfer concerning the drafting of the PDV USA agreement based on the contents of FARA filings from DOJ's website).

These communications were previously produced to the defendants in discovery and the government will seek to offer them as evidence.   Regarding authenticity, a subset of the communications are self-authenticating under Fed. R. Evid. 902 for the reasons discussed below, *see infra* MIL #3; the government will authenticate the remaining communications at trial (if defendants do not stipulate[2]) based on the testimony of witnesses with knowledge thereof, or otherwise pursuant to Fed. R. Evid. 901.

## Argument

### 1.    The communications of participants in the FARA scheme are admissible as party-opponent statements under Fed. R. Evid. 801(d)(2).

The government seeks an *in limine* ruling that the above-referenced communications (to include the MIA Chat Group) are admissible under Fed. R. Evid. 801(d)(2).   The communications

---

[2] The MIA Chat was listed within the preliminary exhibit lists disclosed by both Rivera and Nuhfer earlier this week.   In addition, Rivera's exhibit list includes a number of other items of communications (including his emails) that are also listed on the government's exhibit list.

are plainly relevant to the scheme underlying the pending FARA and money laundering charges, and are authentic as described above.   These communications, moreover, are party-opponent statements that are non-hearsay under Rule 801(d)(2), either because they are (1) Rivera's and Nuhfer's own statements, or (2) because they are statements of the other participants during and in furtherance of the FARA scheme.

Regarding the latter category, including text messages and emails sent by Perera and Gorrin, the Eleventh Circuit recently held that the co-conspirator hearsay exclusion under Fed. R. Evid. 801(d)(2)(E) broadly applies, as relevant here, to participants in a "joint venture" to engage in political activities on behalf of the Venezuelan government in exchange for payment, without regard to whether the declarant was himself acting unlawfully at the time.   *See United States v. Holland*, 117 F.4th 1352, 1356 (11th Cir. 2024) (concluding that the term "conspiracy" in Rule 801(d)(2)(E) "means an arrangement to work together toward a shared goal" regardless of whether the arrangement was illegal, and that the co-conspirator hearsay exclusion applies to statements "made during and in furtherance of a joint venture that included an opposing party").   Perera's and Gorrin's statements are thus admissible under Rule 801(d)(2) to the same extent as Rivera's and Nuhfer's.   The Court should accordingly grant this motion *in limine*.

### 2.   The online news articles cited in defendants' written communications (and within the communications of other persons in furtherance of the FARA scheme) are non-hearsay under the circumstances of this case.

From time to time, the participants in the MIA Chat Group texted each other hyperlinks to, and commented on, online news articles about developments in U.S.-Venezuela relations that concerned their unregistered political activities.   In a number of such instances where the text message did not itself contain the contents of the underlying news article (and only hyperlinked to it), the government intends to introduce portions of the articles' contents—not for the truth of the matter asserted therein, but to show the chat participant's state of mind at the time, for the news

article's effect on the listener, and/or for other permitted purposes.

For example, shortly after the signing of the PDV USA agreement, Gorrin texted the MIA Chat Group (*i.e.*, Gorrin, Rivera, Nuhfer, and Perera) a hyperlink to a Miami Herald article titled "Southcom commander warns Congress of growing humanitarian crisis in Venezuela," as depicted below.   In relevant part, the article stated that a senior U.S. military officer had advised Congress that worsening developments in Venezuela "could trigger a humanitarian crisis requiring regional intervention."   Gorrin elaborated that "[t]he Chancellor [*i.e.*, Delcy Rodriguez] called me, she's very worried . . . they're going to intervene in Venezuela," to which Nuhfer responded, "I don't know that, but I will tell you that we haven't stopped talking about what's going on in Venezuela."[3]



---

[3]  The government has produced to the defendants a translators' certification and English translation of the Spanish-language portions of the MIA Chat Group, and has done the same for various other text threads and email communications that it intends to offer in its case-in-chief. To the extent it has not already done so, the government "commit[s] to provide certified translations for any [other Spanish-language] material it intends to offer at trial."   *United States v. Oztemel*, 2024 WL 2701683, at *1 (D. Conn. May 24, 2024) (denying defendants' request for an order directing the government to produce translations of an expansive set of Portuguese documents and audio recordings, including because the government had committed to provide certified English translations for any such materials offered in its case-in-chief).

As another example, on August 9, 2017, around the time when defendants began working towards obtaining relief from U.S. sanctions for certain Venezuelan officials (*see* ECF 122 pp.9, 23 ¶¶ 13, 66), Nuhfer texted the MIA Chat Group a hyperlink to a Miami Herald article concerning the imposition of U.S. sanctions against eight Venezuelans with ties to the Maduro regime, and then remarked that "we have to move fast":



The government intends to include portions of such online news articles, as indicated above, in presenting the MIA Chat Group thread to the jury.[4]  In each case, the articles will not be offered for the truth of the matter asserted therein (*e.g.*, that there was a humanitarian crisis in Venezuela warranting U.S. intervention, or that the U.S. had imposed sanctions on these specific eight officials); rather, the articles will be offered for their effect on the listener, to reflect the texter's state of mind, to illustrate the meaning of the declarant's accompanying statements in the MIA Chat Group thread, and for other non-hearsay purposes.   The inclusion of the articles in this

---

[4]  The articles are self-authenticating under Fed. R. Evid. 902(6) (printed material purporting to be a newspaper or periodical), and the government will establish that each hyperlink in the text thread linked to the specified online news article through the testimony of its witnesses.

regard would not result in unfair prejudice (including because the FARA-scheme participants texted the hyperlinks themselves), and these materials would be probative in showing to the jury, for example, the Venezuelan government's motivation in directing that outsize payments be made to the participants in the FARA scheme under the PDV USA agreement, and that during the latter half of 2017 defendants were focused on influencing U.S. sanctions policy concerning top Maduro officials.   The government thus moves for the Court to find—assuming that the relevant portions of the MIA Chat Group are admitted into evidence—that the hyperlinked articles within those portions may also be presented to the jury for non-hearsay purposes such as those described above.

### 3. The Court should admit certified domestic records and records generated by an electronic process or system pursuant to Rules 803(6), 902(11) and 902(13).

The government moves *in limine* for the Court to admit certified domestic records that are self-authenticating pursuant to valid records certifications.   Specifically, the government seeks to admit the certified business records described below, pursuant to Fed. R. Evid. 803(6) and 902(11). In addition, the government intends to rely upon certifications of records that were generated by an electronic process or system that produces an accurate result, pursuant to Fed. R. Evid. 902(13) and 902(11), to establish the documents' authenticity.

The documents at issue, and their associated records certifications, have previously been provided to the defense in discovery.   In pertinent part, the certified records include communications obtained from email service providers in the course of the government's investigation, as well as transaction records and other records produced by financial institutions. The government will submit its Rule 902(11) and 902(13) notices pertaining to these records— comprising materials listed on the government's preliminary exhibit list disclosed to the defense on February 4, 2026—in due course.

Under the Federal Rules of Evidence, certain types of evidence are self-authenticating,

meaning they "require no extrinsic evidence of authenticity in order to be admitted," Fed. R. Evid. 902, if accompanied by a valid custodian certification, including "Certified Domestic Records of a Regularly Conducted Activity" and "Certified Records Generated by an Electronic Process or System."   Fed. R. Evid. 902(11) and (13).   Email messages and other documents from internet service providers are self-authenticating if accompanied by a valid certification that conforms to Rules 902(11) and (13).   *See United States v. Spila*, 136 F.4th 1296, 1307–08 (11th Cir. 2025) (upholding district court's decision to admit email records as authentic based on Google's certification); *accord United States v. Gal*, 606 Fed. App'x 868, 874–75 (9th Cir. 2015).

Importantly, this motion *in limine* does not seek to limit defendants' right to object at trial to the admission of specific documents covered by the certifications, in whole or in part, on other evidentiary grounds (to include relevance and undue prejudice).   *See Spila*, 136 F.4th at 1308.

The government submits that the relief requested herein is warranted to promote efficiency at trial, including by avoiding the need for the government to call multiple records custodians.   In addition, through this motion and the government's other disclosures to the defense, the government has satisfied the requirement of advance notice addressed in Rule 902(11). Accordingly, the government moves the Court to admit the aforementioned records as self-authenticating pursuant to Fed. R. Evid. 902(11) and 902(13).[5]

4.      **The Court should admit Rivera's deposition testimony in the SDNY civil action between Interamerican and PDV USA.**

---

[5] In seeking the relief requested herein, the government does not take the position that the certified documents at issue may only be authenticated under Rule 902.   Further, the government advises defendants that it reserves its rights to seek the documents' admission under other provisions of the Federal Rules of Evidence; to refrain from offering into evidence all of the documents on the government's exhibit list that are covered by the certifications; and to seek to introduce the testimony of records custodians as part of its presentation at trial.

As the Court is aware, in May 2020, PDV USA filed a contract action in the SDNY seeking to recover $15 million paid to Interamerican in connection with the PDV USA agreement.   In August 2021, following the denial of its motion to dismiss, Interamerican (solely owned and controlled by Rivera) answered and counterclaimed against PDV USA for $30 million, allegedly the balance of the $50 million due to Interamerican under the agreement.   *See PDV USA, Inc. v. Interamerican Consulting, Inc.*, Case No. 20-cv-3699 (S.D.N.Y.).   Over the course of two days in July 2022, and a third day in April 2025, Rivera provided sworn deposition testimony in defending PDV USA's claims and in supporting Interamerican's counterclaims.[6]   During his July 2022 deposition testimony, Rivera was questioned extensively on topics including the drafting of the PDV USA agreement, as well as the relationship between the agreement and his efforts to influence U.S.-Venezuela relations in 2017 and 2018.   At a number of points in that testimony, Rivera made statements that are both directly relevant to the pending charges and controverted by the government's anticipated evidence at trial.   For example, Rivera stated that Interamerican was not involved in the drafting of the scope-of-services portion of the PDV USA agreement, and that his work towards the lifting of U.S. sanctions against a Maduro associate (Erick Malpica Flores, identified as "Family Member 1" in the indictment) had nothing to do with the PDV USA agreement—in each case, assertions the government views to be squarely at odds with his contemporaneous written communications.

Subsequently, in his April 2025 deposition, Rivera denied that he had conducted any research regarding FARA in connection with the formation of the PDV USA agreement, and further denied that he had considered FARA in reviewing a draft of the agreement.   *But see* ECF

---

[6] In deciding to testify at his July 2022 deposition, Rivera was aware that he was then a target of a criminal investigation.   *See* ECF 276 (Order Denying Deft's Second Discovery Motion) at 4.

122 p.12 ¶¶ 5–6 (indictment allegations describing Rivera's receipt on March 20, 2017—one day before the agreement's signature and Rivera's submission of the first $5 million invoice to PdVSA—of an email titled "FARA Contracts" that contained excerpts of FARA filings, and Rivera's use of this material to draft the scope-of-services portion of the agreement).   Rivera specifically acknowledged, however, that he had seen FARA filings close in time to when Interamerican entered into the PDV USA agreement, testifying that he remembered seeing FARA filings as of December 2016, January 2017, February 2017, and probably also March 2017—the month the PDV USA agreement was signed.

At trial, the government intends to offer as evidence against Rivera the statements he made in his SDNY deposition testimony by introducing video and written transcripts thereof.[7]   Rivera's own statements from the deposition testimony, when offered against him in this criminal trial, are admissible as quintessential statements of a party opponent under Fed. R. Evid. 801(d)(2)(A). *See, e.g.*, *United States v. Archie*, 2017 WL 11471580, at *1 (N.D. Ga. Jan. 19, 2017) (ruling that prosecution could offer statements that criminal defendant made in prior civil deposition testimony under Rule 801(d)(2)(A) (citations omitted)).   In addition, the transcripts of the deposition are self-authenticating documents because they were accompanied by a certificate of acknowledgment executed by a notary public.   *See* Fed. R. Evid. 902(8).   Moreover, Rivera's statements in testifying about the PDV USA agreement and his activities regarding U.S.-Venezuela relations in 2017 and 2018 are plainly relevant to the pending charges.   Among other respects, Rivera's

---

[7] The parties to the SDNY civil action had in place a protective order governing discovery in that matter (SDNY DE #55).   Interamerican's attorneys did not designate Rivera's deposition testimony as "confidential" pursuant to the parties' stipulated protective order and, to the government's knowledge, Interamerican's attorneys have not to date asserted in the SDNY civil action that PDV USA violated the parties' protective order in providing copies of Rivera's deposition testimony to the government.

testimony in the SDNY case will be highly probative—when presented alongside his contemporaneous written communications showing the testimony to be false—in demonstrating his consciousness of wrongdoing, as well as his contemporaneous knowledge of FARA (each of which relates directly to the willful *mens rea* the jury must find to convict on the FARA violations).

Circuit precedent permits the government's use in a criminal trial of the defendant's deposition testimony from a prior civil proceeding that involved the same underlying facts as the charged offense. *See United States v. Veltmann*, 6 F.3d 1483, 1500 (11th Cir. 1993) (noting that "statements made in a civil deposition arising out of the same facts as a criminal prosecution are admissible as admissions when offered against the declarant" under Rule 801(d)(2), and finding that statements at issue were not unduly prejudicial under Rule 403). *See also United States v. Jenkins*, 785 F.2d 1387, 1393 (9th Cir. 1986) ("Because White's statements at the deposition were voluntary, they were clearly admissible against him [in the criminal trial] as party admissions under [Rule] 801(d)(2)(A)"); *see also United States v. Frost*, 234 F.3d 1023, 1024–25 (8th Cir. 2000) (reversing the trial court's grant of criminal defendant's motion *in limine* to exclude his civil deposition testimony as unduly prejudicial under Rule 403, rejecting his argument that the deposition could "lead the jury to convict him solely on the grounds that he [had been] untruthful").

In sum, the use of Rivera's civil deposition testimony in this criminal trial is permitted under the Federal Rules of Evidence and Circuit precedent, and the Court should accordingly grant the motion *in limine*.

### 5. The Court should admit summaries of voluminous materials as evidence pursuant to Fed. R. Evid. 1006.

The government seeks an *in limine* ruling admitting a series of summary exhibits of voluminous bank records pursuant to Federal Rule of Evidence 1006. These approximately ten exhibits, described further below, are plainly within the scope of Rule 1006 because they

summarize records that are: (1) voluminous; (2) cannot be conveniently examined in court; (3) are otherwise admissible; and (4) were previously provided to the defense for examination. Moreover, the government is producing its Rule 1006 summary exhibits in advance of trial, and the exhibits will be admitted through the testimony of a witness who will attest to their accuracy and who will be available for cross-examination.

In addition to violating and conspiring to violate FARA, defendants are charged with conspiring to engage in transactions in criminally derived property and several substantive counts of the same. As part of its case-in-chief to support these money-laundering counts, the government intends to introduce summaries of voluminous bank records to show the source and flow of the proceeds of the FARA scheme that Interamerican received via the four $5 million transfers from PDV USA/PdVSA (as described above), which flowed through to the accounts of other participants in the scheme and were used in transactions giving rise to the substantive money-laundering counts. The underlying bank records were previously disclosed to the defense and would be admissible as evidence in their own right (including as certified domestic records under Rules 803(6) and 902(11)).[8]

However, presenting the underlying records to the jury in a concise, efficient manner is not feasible as the records span many, many hundreds of pages divided between dozens of separate bank statements and other documents from different time periods involving an array of financial institutions (and still more of those institutions' accounts).

For this reason, the government seeks to introduce a series of exhibits summarizing the bank records and other materials referenced above, via graphic charts with appropriate titles and

---

[8] As noted above, the government is moving *in limine* for a ruling as to these bank records' authenticity. The government will file its Rule 902 notice for the bank records (which are identified in relevant part on the government's exhibit list) in due course.

captions.   The records and data supporting these summaries have been produced to defendants in electronic format via the government's discovery productions that were made well over a year ago. The underlying data, moreover, are admissible as certified records of regularly conducted business activity.   In addition, the summaries will be introduced through a forensic accountant who will testify to the validity of the summaries and be subject to cross-examination.

"The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, ***whether or not they have been introduced into evidence***."   Fed. R. Evid. 1006(a) (emphasis added).[9]

The party seeking to admit such summaries into evidence must make the underlying voluminous materials available to all other parties for examination at a reasonable time and place. Fed. R. Evid. 1006(b).   The Eleventh Circuit has interpreted Rule 1006 "as treating summaries as evidence under circumstances where, in the court's discretion, examination of the underlying documents in a trial setting cannot be done conveniently."   *United States v. Atchley*, 699 F.2d 1055, 1059 (11th Cir. 1983) (quoting *United States v. Smyth*, 556 F.2d 1179, 1184 (5th Cir. 1977), *cert. denied*, 434 U.S. 862 (1977)).   Rule 1006 summaries may contain assumptions, so long as those assumptions are supported by evidence in the record.   *United States v. Melgen*, 967 F.3d 1250, 1260 (11th Cir. 2020).   Moreover, the summaries may contain highlights, bolding, or other

---

[9] In December 2024, Rule 1006 was amended to make clear that summary exhibits are admissible as evidence, and further that a properly supported summary may be admitted into evidence whether or not the underlying voluminous materials reflected in the summary have also been admitted. The government advises the Court, as reflected in the amendment notes, that before the 2024 amendment some courts had indicated that the underlying materials must be admitted into evidence for a summary to be admitted, or that the admission of the underlying materials meant that the summary could not also be admitted as evidence.   Following the 2024 amendment, it is clear that Rule 1006 summaries are admissible as evidence without regard to the admission into evidence (or not) of the underlying records.

appropriate notations. *United States v. Lewis*, 2023 U.S. App. LEXIS 25170, at \*5–6 (11th Cir. Sept. 22, 2023). In addition, defendants "will have the opportunity to cross-examine the [forensic accountant] who will introduce the charts, and it will be up to the jury to decide what weight to give the charts and testimony." *United States v. Trujillo*, 2023 U.S. Dist. LEXIS 68056, at \*3, \*8 (S.D. Fla. Apr. 18, 2023).

The Eleventh Circuit has approved the admission of summary charts of similar records and done so in similar circumstances to those present here. *See*, *e.g.*, *Lewis*, 2023 U.S. App. LEXIS 25170, \*6–7 (upholding, under pre-2024 version of Rule, admission of Rule 1006 charts including bank records to show flow of funds between co-conspirators); *see also Melgen*, 967 F.3d at 1260.

Accordingly, the government submits that the summary charts it seeks to introduce, based on underlying admissible records available to the defense, through a witness subject to cross-examination, should be admitted as substantive evidence at trial.

6. **The Court should permit the government to ask hypothetical questions in inquiring whether its witnesses (including government officials) would have interacted with defendants regarding Venezuela matters had they known that defendants were being compensated by PdVSA and its U.S. affiliates pursuant to an agreement approved by senior Venezuelan officials.**

As alleged in the superseding indictment, an essential component of defendants' conspiracy to violate FARA was their need to conceal from public scrutiny "the existence of the consulting agreement with PDV USA, and the millions of dollars" paid to them by the Venezuelan state oil company for their lobbying on behalf of the Venezuelan government. ECF 122 at p.11 ¶ 15. Consequently, throughout their interactions with the U.S. officials and other persons who were the focus of their unregistered political activities, defendants did not disclose that they were receiving tens of millions in compensation for such engagement, through a contract that had been approved by senior officials of the Venezuelan government. *Id.* At trial, the government will seek to demonstrate that defendants' concealment of the agreement (and its approval by

Venezuelan officials) throughout these interactions was motivated by their desire to avoid the personal and professional repercussions expected to result from the public's knowledge of such outsize compensation from the Venezuelan state oil company, as approved by the Maduro regime. That motivation, moreover, is highly probative to the jury's determination of whether defendants' failure to register under FARA—which presumably would have required that the PDV USA agreement be published on DOJ's website (as defendants well knew)—was not merely an oversight, but intentional and willful.

Accordingly, the government intends to ask certain of its witnesses, including government officials who interacted with defendants, if they would have done so had they known of the PDV USA agreement, the tens of millions originating from the Venezuelan state oil company paid thereunder, and the agreement's approval by senior officials of the Maduro regime.

Case law instructs that the government may use such hypothetical questions in the examination of its witnesses. *See, e.g.*, *United States v. Hill*, 643 F.3d 807, 841–43 (11th Cir. 2011) (rejecting mortgage-fraud-scheme defendant's challenge under Fed. R. Evid. 702 to the use of hypothetical questions posed to victim lenders concerning whether the disclosure of misrepresentations in loan applications would have affected their loan approvals); *United States v. Laurienti*, 611 F.3d 530, 549–550 (9th Cir. 2010) (rejecting defendants' challenge to "guilt-assuming hypothetical" questions posed to government's witnesses in securities-fraud prosecution) (citing *United States v. Jennings*, 487 F.3d 564, 581–82 (8th Cir. 2007)); *see also United States v. Cuti*, 720 F.3d 453, 458–59 (2d Cir. 2013) (rejecting, in appeal from securities-fraud conviction, CEO's challenge on several grounds to hypothetical "what-if-you-had-known" questions to auditor witnesses on the effect of withheld information on transactions' accounting

treatment) ("[A] witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior.").[10]

Moreover, the inquiry the government proposes here is not barred by jurisprudence precluding the use of guilt-assuming hypothetical questions to cross examine the defense's *character* witnesses.   *See United States v. Guzman*, 167 F.3d 1350, 1352 (11th Cir. 1999) (holding that cross examination of defense character witnesses cannot employ "hypothetical questions that assume the guilt of the accused in the very case at bar").   For one, that jurisprudence does not apply to the government's direct examination of its own witnesses.   *See Laurienti*, 611 F.3d at 549–550 (explaining this distinction) ("[T]here appears to be no support for the proposition that the government cannot ask its own fact witnesses otherwise relevant questions that may have a guilt-assuming element."); *accord Cuti*, 720 F.3d at 460.   And in any event, the hypothetical questions the government proposes to ask would not assume defendants are guilty of engaging in political activities for the Venezuelan government while willfully failing to register therefor under FARA.   Rather, consistent with the case law above, the government would merely inquire whether its witnesses would have interacted with defendants had they known of their compensation under the PDV USA agreement, the agreement's approval by senior Venezuelan officials, and similar matters lacking any reference to an allegation of willfully failing to register under FARA.

In sum, the motion *in limine* should be granted because the testimony expected from the government's witnesses—namely, that they would not have entertained defendants' efforts to obtain meetings on (and influence over) U.S.-Venezuela relations had they known the

---

[10] *See also United States v. Ranney*, 719 F.2d 1183, 1188–89 (1st Cir. 1983); *United States v. Orr*, 692 F.3d 1079, 1096–97 (10th Cir. 2012).

circumstances of the PDV USA agreement—is probative of the defendants' motive in failing to register under FARA, and appropriate under the authorities discussed above.

7.     **The Court should preclude the defendants from introducing self-serving out-of-court statements.**

The government seeks an *in limine* ruling precluding defendants from introducing their own prior out-of-court statements—including oral statements to fact witnesses and written statements made in email and text messages—as impermissible self-serving hearsay.   The Eleventh Circuit has consistently rejected the efforts of defendants to offer their own self-serving, exculpatory statements through the testimony of other witnesses. *See United States v. Cunningham*, 194 F.3d 1186, 1999 (11th Cir. 1999); *United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985).   In particular, Defendants may not introduce self-serving hearsay statements under Fed. R. Evid. 801(d)(2) because defendants obviously are not party-opponents to themselves.   "[I]f such statements were deemed admissible under Rule 801(d)(2), parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."   *See United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).

Although Fed. Red. Evid. 803(3) creates an exception to the hearsay rule for statements meant to show the defendant's then-existing state of mind, that exception is narrow and is expressly inapplicable when the statement is offered "to prove the fact remembered or believed."   *See also Cunningham*, 194 F.3d at 1199 (affirming exclusion of defendant's out-of-court, post-arrest statement suggesting that he had not been seeking to evade law enforcement, over defense

argument that the statement was covered by Rule 803(3) because it merely demonstrated then-existing state of mind).[11]

Importantly, this rule applies to any writings or recordings defendants may seek to introduce through fact witnesses at trial.  This would include, for example, any exculpatory statements made by either defendant in the aftermath of the May 2020 lawsuit filed by PDV USA against Interamerican, or the return of the initial indictment in November 2022 (both of which were covered extensively in the press).   It further precludes defendants from offering any out-of-court statements made by Rivera or Nuhfer to the effect that their activities concerning U.S.-Venezuela relations in 2017–2018 were unrelated to the PDV USA agreement and done not on behalf of the Maduro government, but rather in coordination with Venezuela's political opposition (*i.e.*, factual claims made by defendants and/or their counsel in a number of fora in recent months).

At a minimum, if defendants wish to introduce self-serving hearsay statements in the form of documentary evidence or recordings, they must "take the stand to lay a foundation" themselves. *See United States v. Marley*, 621 Fed. App'x 936, 941 (11th Cir. 2015) (upholding district court's exclusion of memorandum prepared by defendant as self-serving hearsay where defendant attempted to introduce the memo in cross-examining a government witness, noting the district court's reasoning that "if the defense wished to offer the memo, [defendant] would have to take the stand to lay a foundation for its contents"); *United States v. Bond*, 87 F.3d 695, 699–700 (5th Cir. 1996) (excluding audio recording on similar grounds).

---

[11] Should defendants seek to argue that such statements are being offered for some permitted purpose under the rules relating to hearsay, the Court should insist that they articulate the relevance of the purported purpose.  (*E.g.*, if a statement is purportedly offered for the effect on the listener, there must be reason to believe that the statement indeed had such an effect, without regard to the truth or falsity of the statement.)   The Court's inquiry in this respect is appropriate and necessary to ensure that the hearsay rules are not circumvented through unfounded attempts to expand exceptions and exclusions beyond their proper scope.

For the reasons discussed above, the Court should preclude defendants from offering any self-serving out-of-court statements.

**8.      The Court should preclude the introduction into evidence of law enforcement interview reports.**

The government seeks an *in limine* ruling precluding defendants from using law enforcement reports to impeach or otherwise cross examine witnesses who did not author or adopt those reports.   In providing broad discovery to the defense, the government produced FBI, IRS, and HSI interview reports for witnesses the government anticipates calling at trial.   Black-letter law provides that as a general matter such reports and interview memoranda are not statements of the persons interviewed; rather, they are an agent's summary, and such summaries are not statements within the scope of the Jencks Act (18 U.S.C. § 3500).   Accordingly, the Court should preclude the defense from: (i) introducing the contents of such reports to improperly impeach witnesses during cross-examination; (ii) publishing the contents of such reports to the jury; or (iii) otherwise suggesting to the jury that such reports are statements of witnesses who did not write or adopt them.

The Jencks Act requires that after a witness for the United States testifies on direct examination, the Government must provide the defense with any statements made by the witness that relates to the subject of his or her testimony.   18 U.S.C. § 3500.   However, a statement within the meaning of the Jencks Act is defined as "a written statement made by said witness and signed or otherwise adopted or approved by him"; a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously"; or a statement made by the witness to the grand jury.   18 U.S.C. § 3500(e).

It is firmly established that reports written by agents do not fall within the Jencks Act as a general matter. "[S]ummaries of an oral statement which evidence substantial selection of

material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced [as Jencks Act materials]." *Palermo v. United States,* 360 U.S. 343, 352–53 (1959). Interview reports are "not Jencks Act statements of the witness unless they are substantially verbatim and were contemporaneously recorded, or were signed or otherwise ratified by the witness." *United States v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003).

The defense may, of course, ask a witness whether he or she made a statement that is reflected in an agent interview report.   However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the contents of the interview report as a prior inconsistent statement unless the report was signed or otherwise adopted by the witness.   The Eleventh Circuit made this clear when it held that a law enforcement memorandum of a witness interview could not be used to impeach that witness "unless the witness has subscribed to or otherwise adopted the statement as his own."   *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993).   And, more generally, the defense may not use the interview report to suggest to the jury that the interview report is a statement of the witness.   *See United States v. Marks*, 816 F.2d 1207, 1210–11 (7th Cir. 1987) (holding that where defense counsel read from an interview report during cross-examination in a way that would "seem authoritative" and potentially confuse the jury, the judge was entitled to require the witness be shown the interview report and given the opportunity to adopt or reject it as a statement, although such a practice was no longer required by the Federal Rules of Evidence).   To allow otherwise would subvert the meaning of the Jencks Act and the Supreme Court's decision in *Palermo*, which held that it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." *Palermo*, 360 U.S. at 350.

Accordingly, the government requests that this Court preclude the defendants from improperly impeaching the government's witnesses with interview reports that they did not author or adopt themselves.

### 9. The Court should preclude defendants from offering evidence or argument about recent changes in the Justice Department's FARA enforcement priorities.

Following the Attorney General's memorandum dated February 5, 2025 that announced (among other things) changes in Justice Department policy regarding the criminal enforcement of FARA, defendants' counsel wrote DOJ officials on a number of occasions to seek dismissal of the pending charges based on the memorandum. Separately, in July 2025, defendants moved for dismissal of the charges in the superseding indictment on First Amendment grounds, citing (among other bases) the February 2025 memorandum. ECF 283. The Court has denied defendants' motion, and the government has declined defendants' request to dismiss the pending charges.

Defendants' arguments for dismissal of the FARA counts based on the February 2025 memorandum, whether stated in their First Amendment motion, their correspondence to DOJ, or otherwise, lack any relevance to the issue of whether Rivera and Nuhfer willfully violated or conspired to violate FARA. Accordingly, the Court should preclude the defense from offering evidence or argument based on such considerations.

In an analogous context, the court in *United States v. Liu* granted the government's motion to preclude the defense's cross-examination or introduction of evidence about the Justice Department's policy known as the "China Initiative" (concerning a greater focus on allegations of espionage, trade-secret theft, and other criminal conduct with a nexus to the government of the People's Republic of China):

> Whatever knowledge the Government's witnesses may have about the China Initiative reflects nothing about the knowledge or states of mind of unrelated third parties. Asking about the China Initiative would quickly devolve into evidence explaining why

> the Department of Justice announced a 'China Initiative,' and why it and the [FBI] were focused on China as part of their counterintelligence program. . . . None of that evidence is remotely relevant to whether Defendant is guilty of the charged crime. In short, evidence related to the China Initiative is not relevant.

*United States v. Liu*, 2022 WL 773315, at *2 (S.D.N.Y. Mar. 14, 2022).  Here, as in *Liu*, no evidence or argument regarding the government's enforcement priorities for FARA would be "remotely relevant" to the pending charges.  *See also United States v. Tao*, 2022 WL 252019, at *16 (D. Kan. Jan. 27, 2022) (agreeing that "the Department of Justice's strategic priorities and Defendant's views on that topic are not proper issues for the jury to consider," and granting motion to preclude the defendant from referring to the China Initiative at trial).[12]

**10.   The Court should preclude defendants from offering evidence or arguing that this prosecution is unwarranted due to the government's unfair or selective enforcement of FARA.**

Any statements or arguments from the defense regarding selectivity or unfairness in this prosecution—including based on the existence of uncharged co-conspirators or the relative role or culpability of other persons involved in the FARA scheme—are legally improper, not relevant to either defendant's individual guilt, and should be precluded as having no probative value.  *See United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution"); *United States v. Jeong*, 624 F.3d 706, 713 (5th Cir. 2010) (noting that the government "retains broad discretion as to whom to prosecute") (citing *Wayte v. United States*, 470 U.S. 598, 607 (1985)).  The same is true with respect to any argument, akin to that in defendants' motion to dismiss, to the effect that FARA is

---

[12] *See also United States v. Hobson*, 2:22-cr-00086-RJC (W.D. Pa.), ECF Nos. 126 & 157 (granting government's motion to preclude defendant from offering evidence or argument related to the   exercise of prosecutorial discretion under new executive-branch FCPA enforcement policy).

not enforced consistently or fairly.   *See* ECF 283 at 10 ("FARA has become a broken-taillight law; it is constantly violated but rarely enforced," "[a]nd when it is enforced, it tends to be because the government is using it as a pretext to target individuals who have . . . fallen into disfavor."). Any statements or arguments based on such notions are wholly without factual or legal relevance and would only serve to prejudice and mislead the jury.

Moreover, permitting any such argument by the defense would be tantamount to a request for jury nullification.   "Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court."   *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997).   The Eleventh Circuit has unequivocally disapproved of nullification, including by issuing clear guidance that "defense counsel may not argue jury nullification during closing argument."   *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) (collecting cases in support of proposition that a defendant has no right to present evidence or make arguments in furtherance of nullification).   Because "trial courts have the duty to forestall or prevent such conduct," *Thomas*, 116 F.3d at 616, the Government moves to preclude evidence and argument designed to convince the jury to acquit not because the government failed to prove the crimes charged against defendants, but rather because a guilty verdict would be contrary to one's sense of justice, morality, or fairness.   *See United States v. Lucero*, 895 F. Supp. 1421, 1426 (D. Kan. 1995) ("[D]efendants are not entitled to present evidence which is irrelevant for any purpose other than to provoke the finder of fact to disregard the law.").

Here, improper evidence and arguments in this vein would include the suggestion that this prosecution is unfair because the government has elected to prosecute defendants but not other persons for violating FARA.   The decision to charge specific individuals involved in this FARA

scheme, the reasons behind the government's charging decisions in FARA enforcement generally, and the relative role or comparative culpability of the defendants as compared to others, are all examples of irrelevant and unfairly prejudicial evidence. *See, e.g.*, *United States v. Thompson*, 2001 WL 498430, *16 (5th Cir. Apr. 9, 2001) (unpublished) (upholding grant of government's motion *in limine* to prevent counsel from comparing defendant's conduct to that of other uncharged or immunized witnesses); *see also United States v. Re*, 401 F.3d 828, 833 (7th Cir. 2005) (government's exercise of prosecutorial discretion is not proper subject for cross-examination). Thus, the defendants should be precluded from making arguments or comments to the jury—and from eliciting statements on cross-examination—that seek to inject into this trial such improper considerations relating to the government's charging decisions and enforcement of FARA.

### 11. The Court should preclude defendants from offering evidence for which they did not make the proper disclosures by rule, including expert testimony.

In producing discovery to the defense, the government has requested that Rivera and Nuhfer's counsel produce reciprocal discovery as required by rule.   To date, they have produced a relatively small amount of reciprocal discovery.   Assuming defendants have no additional discovery to provide, the defense's limited production to date is no cause for concern.   But if defendants intend to disclose or introduce voluminous documents and other discovery during or just prior to trial, that would violate Rule 16.   Any such evidence should be excluded.

Rule 16(b)(1)(A) requires defendants to disclose to the government any documents or tangible objects in their possession, custody, or control that they intend to use in their case-in-chief.   Under Rule 16(d)(2), this Court may prohibit defendants from introducing undisclosed evidence at trial.   *See United States v. Prather*, 205 F.3d 1265, 1271–72 (11th Cir. 2000) (affirming conviction of defendant where district court had excluded evidence for failure to comply with Rule 16 reciprocal discovery obligations).

The government anticipates that either Rivera or Nuhfer may seek to introduce materials not already disclosed at trial, whether through cross-examination of the government's witnesses or through their own.  In either case, such evidence must be disclosed to the government in advance of trial.  Given that relatively little reciprocal discovery has been provided to date, the government is filing this motion to avoid needless surprise at trial that would be both improper under the law and could delay the proceedings.  Indeed, Rule 16 is designed "to avoid surprise and gamesmanship."  *United States v. Hsia*, 2000 WL 195067, at *1 (D.D.C. Jan. 21, 2000).

To be clear, defendants cannot avoid their discovery obligations by claiming that the government already possesses such documents. *See, e.g.*, *United States v. Crinel*, 2016 WL5779778, *2 (E.D. La. Oct. 4, 2016) ("[A] defendant is required to produce all required materials, including those already in the government's possession").   Nor can they claim that they do not have to produce documents that they would only seek to introduce during cross-examination of a government witness.  *See id.* at *4 ("[A] defendant's case-in-chief includes any documents a defendant intends to use during cross-examination of a government witness except for the purpose of impeachment.").  In short, Defendants are required to produce all non-impeachment material they intend to use at trial:

> Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant . . . [W]here a defendant cross examines a government witness to buttress her theory of the case, rather than to impeach the testimony given by the witness on direct examination, the cross-examination is properly seen as part of the defendant's case-in-chief.   Indeed, this interpretation of Rule 16 has been adopted by almost every district court to consider the issue.

*United States v. Napout*, 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (citations omitted).

To the extent defendants would respond that they cannot "fairly be expected to know what their case-in-chief will be, or whether there will even be one, before the government calls a single

witness," the government would ask that this Court do what the trial court did in *Napout*:

> To address this practical challenge, the Court adopted the approach used by many courts, and advised Defendants that if they sought to introduce an exhibit as affirmative evidence at trial—*i.e.*, for a purpose other than impeachment—the Court, on the government's motion, would consider whether the defense had failed to timely disclose that exhibit under Rule 16.   Defendants were cautioned that if the Court determined that a Defendant could have made timely disclosure, but failed to timely do so, the defendant ran the risk that the exhibit would be excluded.

*Id.* at 8.   Here, in order to ensure that the trial proceeds in a timely and orderly fashion, the government submits that a deadline of February 27, 2026 is a reasonable one for the defense to produce any discovery as described in *Napout*.

In addition, the government requests that the Court preclude defense expert testimony for which the defense fails to provide adequate disclosure.   Under Local Rule 88.10, when discovery concerning expert witnesses has been requested and is required to be made pursuant to Rule 16, a party must provide "[a]n initial written summary of the anticipated [expert] testimony that is subject to disclosure" within fourteen days of the opposing party's written request pursuant to Rule 16.   The summary must include a "synopsis" of the anticipated expert opinions, the bases and reasons for those opinions, and either the expert's qualifications (if already selected) "or the type of expert witness who will be providing the anticipated testimony."

Here, in response to the defense's request by email in early December 2025 for expert-related disclosure, the government informed the defense on December 10, 2025 that it intended to call a non-attorney employee from the DOJ FARA Unit to testify about several identified FARA-related topics (including defendants' non-registration), and of the government's view that although this witness would not be providing expert opinion testimony within the scope of Rule 702, it would in an abundance of caution provide a disclosure for him containing the items specified in Rule 16(a)(1)(G), before the 21-day-before-trial deadline specified in Local Rule 88.10.   The government also requested that defendants, in turn, disclose an initial written summary of any

anticipated defense expert testimony.   The deadline by local rule for defendants to provide their initial written summary passed without comment fourteen days later, and counsel have yet to provide any type of disclosure regarding anticipated defense expert testimony.

Although the government does not ask that the defense be precluded from offering any experts based on their failure timely to provide the initial written summary, it does request that the Court grant such relief if defendants do not produce the formal expert disclosures addressed in Rule 16(b)(1)(C) by February 23, 2026—the 21-day-before-trial deadline specified for such disclosure.   *See* LR 88.10(o)(3)(B)(iii).   Such relief is proper where, as provided by rule, the prosecution must receive such disclosure "sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence."   Fed. R. Crim. P. 16(b)(1)(C)(ii).

### 12.   The Court should exclude evidence and argument relating to a public-authority defense.

At times in defense counsel's discussions with the government, in Rivera's statements regarding the PDV USA litigation, and in the defense's arguments for dismissal to DOJ, defendants or their counsel have suggested that the unregistered political activities described in the indictment did not give rise to criminal liability because such activities were approved by senior U.S. government officials.   To date, however, the defense has yet to disclose any discovery or provide information tending to establish any component of the defenses of public authority or entrapment by estoppel.   *See United States v. Alvarado*, 808 F.3d 474, 484–86 (11th Cir. 2015) (describing these defenses and their required elements).

In light of these suggestions, counsel for the government inquired as early as November 2024 whether the defense would assert a public authority-type defense, including whether anyone in the U.S. government had authorized defendants not to register under FARA or had been informed of the $50 million PDV USA agreement.   In December 2025, the government emailed

counsel for the defendants to ask again whether Rivera or Nuhfer intended to assert a defense of actual or believed exercise of public authority.   To date, the defense has yet to confirm one way or the other whether they intend to assert such a defense.

The government seeks a ruling from the Court to preclude the defendants from offering evidence and argument at trial in support of a public-authority or entrapment-by-estoppel defense. *See* Fed. R. Crim. P. 12.3.   Rule 12.3 provides:

> If a defendant intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense, the defendant must so notify an attorney for the government in writing and must file a copy of the notice with the clerk within the time provided for filing a pretrial motion, or at any later time the court sets.

The Rule specifies the contents of the requisite notice and, assuming one is made, the procedures and timing by which the government and defense must disclose information concerning the defense.  *See id.*   Rule 12.3 further instructs that if "a party fails to comply with this rule, the court may exclude the testimony of any undisclosed witness regarding the public-authority defense," although the court may not limit the defendant's right to testify.   Fed. R. Crim. P. 12.3(c).

Here, neither defendant notified an attorney for the government in writing or filed a notice "within the time provided for filing a pretrial motion," and in light of the government's prior inquiries on this matter, the Court should preclude evidence and argument in support of such a defense under the plain terms of Rule 12.3.   *See, e.g.*, *United States v. Alarcon-Rodriguez*, 789 F. Supp. 3d 164, 173 (D.P.R. 2025) (finding that exclusion of testimony in support of entrapment-by-estoppel defense was warranted where defendant failed to make the requisite notice specified in Fed. R. Crim. P. 12.3).

**13.    The Court should preclude defendants from offering evidence or argument that their actions were in conformance with U.S. foreign policy.**

In defense counsel's filings and submissions seeking dismissal of the pending charges (among other fora), counsel have suggested that defendants may not be criminally liable under FARA because their activities in 2017–18 were done in coordination with (or in parallel to) members of the Venezuelan political opposition who were seeking Maduro's removal from power, consistent with U.S. foreign policy at the time.   Such suggestions are unfounded.   Whether defendants' activities relating to Venezuela aligned with U.S. foreign policy is irrelevant to the question of whether they violated or conspired to violate FARA.   FARA, by its terms, prohibits undisclosed lobbying and other political activities to shape policy at the direction or request of a foreign government—without reference to the contents of the policy.   *See, e.g.*, 22 U.S.C. § 611(c), (o); *id.* § 612(a).   Indeed, the Supreme Court has recognized that FARA registration is "comprehensive, applying equally to agents of friendly, neutral, and unfriendly governments." *Meese v. Keane*, 481 U.S. 465, 469–70 (1987).   Thus, whether defendants, in acting as unregistered foreign agents of the Venezuelan government, took steps that could be construed as consonant with U.S. foreign policy has no bearing on whether they committed the alleged violations of FARA.   And in addition to lacking any probative value, evidence and argument along those lines would present a significant risk of confusing the jury.

The Eleventh Circuit has long recognized that evidence "based upon an invalid defense should be excluded because [it is] irrelevant as a matter of law to the charges of the indictment." *United States v. Anderson*, 872 F.2d 1508, 1516 n.12 (11th Cir. 1989); *accord United States v. Montgomery*, 772 F.2d 733, 736–37 (11th Cir. 1985) (rejecting defendant-appellants' argument that they should have been allowed to submit evidence bearing on defense of justification based on international law).   Here, as explained above, evidence and argument that defendants' activities in 2017–18 were somehow in furtherance of U.S. foreign policy would be irrelevant to

the issue of whether they criminally violated FARA by willfully failing to register for political activities done on behalf of the Venezuelan government.   Accordingly, the Court should preclude defendants from offering evidence or arguing that their conduct was consistent with U.S. foreign policy.   Any such argument would be irrelevant to any issue of material fact, and would only serve to confuse the issues and mislead the jury.   *See* Fed. R. Evid. 403.

**<u>Conclusion</u>**

The government respectfully requests that the Court grant its motion *in limine*.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:      /s/ David J. Ryan

Harold E. Schimkat, AUSA
Roger Cruz, AUSA
Court ID No. A5500567
Fla. Bar No. 157971
99 N.E. 4th Street, 4th Floor
Miami, Florida 33128
Office: (305) 961-9298
Cell: (786) 378-4344
Harold.schimkat@usdoj.gov

&

David J. Ryan
Trial Attorney, National Security Division
Special Bar ID No. A5503306
District of Columbia Bar No. 888325195
950 Pennsylvania Ave., NW, Room 7700
Washington, DC 20530
Tel: (202) 353-7842
David.ryan2@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 6, 2026, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

_/s/_____
David J. Ryan