**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20552-DAMIAN/TORRES**

UNITED STATES OF AMERICA,

vs.

ESTHER NUHFER, et al.,

      Defendants.

_____/

**ESTHER NUHFER'S REPLY IN SUPPORT OF HER MOTION**
**FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**

The government's response proves our point. We asked five specific questions, each answerable with a single document or a single witness if the evidence existed. Identify a communication in which a foreign official asked Esther to do anything. Identify a witness who said Esther agreed to violate FARA. Identify proof that Venezuela paid Esther in exchange for not registering. Identify an agreement by Esther to launder money. And, as to every count, identify one piece of evidence that Esther acted with criminal intent.

Twenty-five pages later, the government has answered none of them. It could not, because the answers do not exist.

Strip the opposition to its frame and the case against Esther comes down to three calculating maneuvers. First, most of the government's response is just rank speculation with arguments that it did not even raise during the lengthy trial. Second, it leans on evidence that is really about David Rivera, not Esther. And finally, it repeats claims the trial itself disproved.

The first tactic, speculation, is the one the government leans on hardest. Esther did not write back after Rivera told the group they did not need to register. So, the government guesses, she must not have believed him. Really? Since when does silence mean disagreement? When a

1

former Congressman you trust explicitly tells you a deal is legal, you do not fire off a rebuttal. You move on. The natural reading of Esther's silence is understanding and agreement, which is the opposite of a guilty mind. *And there is no actual evidence to the contrary.*

So because the government cannot explain the **only** direct piece of evidence establishing Esther's *mens rea* (her innocent mind and lack of criminal intent), it resorts to suggesting an unsupported dark reading that it makes for the first time after trial.[1] It does this, even though the government's star witness, "partner" Hugo Perera, who it decided it was not legally appropriate to charge based on his lack of intent, also did not respond to the October 5, 2017 pronouncement that FARA registration was not required.   The government believed the multi-convicted felon, fraudster, and admitted liar Perera when he said he relied on Rivera's communication about the legality of their actions and attorney opinion that they did not need to register with FARA.  Further, it accepted Perera's silence in response to Rivera's October 5 text as agreement.  But based on nothing except rank speculation, the government inexcusably refuses to extend the same conclusion to Esther, an individual with no prior convictions and whom every witness who knew her described as honest and trustworthy.

The government's other move is deflection.  When the government needs to show intent, it quotes Rivera. When it needs direction from Venezuela, it quotes Gorrín. When it needs an agreement, it asks the Court to assume one. Esther recedes into the background of her own

---

[1] In other instances when it suits the government's theory, it of course asserts the opposite.  If Esther did not respond to a statement by another individual and the government found that statement helpful to its case, the government claims that Esther's silence meant that she agreed with the statement.  The most repeated example of this is "CRISIS=OPPORTUNITY."  Esther did not respond to this comment by Raúl Gorrín.  So, the government regularly howled that Esther and Rivera agreed with the statement.  Though the government cites in its Response a text that Esther sent several minutes later, that text clearly had nothing to do with Gorrín's comment.  Cherry-picking at its best.

prosecution. That is no accident. Not one of the fourteen trial witnesses testified that Esther agreed to break the law or acted with a guilty mind.

Not one.

The third scheme employed by the government is the boldest, because the trial record refutes it. One example: the government tells the Court that Esther stayed home from Venezuela to protect a political campaign. Its own witness admitted on the stand that she only assumed Esther was on a campaign, but did not know it.  Tr. (Mar. 31) 209:9, 14–16 ("I don't know. That's what I thought she was doing."; "Q. The bottom line is she didn't want to go to Venezuela, right? A. Right."). Another: the government calls Esther uniquely familiar with FARA. Its own witness, who flew to Caracas on Gorrín's plane and met Maduro face to face, testified that she never registered either, because the client was an American company and the work was a business deal. The government is asking this Court to credit, after the verdict, a version of the facts that came apart in front of the jury.

This reply does not repeat our motion. It meets the government on the ground it chose and shows that all three of its methods fail. Speculation is not proof beyond a reasonable doubt. Rivera's conduct is not Esther's. And a story the trial disproved cannot support a conviction. In the end, the opposition asks this Court to do the one thing Rule 33 forbids: take a pile of innocent facts, call the pile guilt, and then demand "special deference" for having assembled it. *United States v. Rafiekian*, 68 F.4th 177, 189–90 (4th Cir. 2023). Judgment of acquittal should be entered under Rule 29 on all counts. At a minimum, the verdict against Esther is against the great weight of the evidence, and a new trial should be ordered under Rule 33.

## I.  The Government Tried the Wrong Case.

A six-week trial about David Rivera is not proof against Esther Nuhfer. Yet that is what the government's opposition relies upon. Its statement of the evidence is organized around "the FARA scheme," "the partners," and "the defendants," almost never around what Esther herself knew, agreed to, or intended.

Consider the government's own catalog of chats offered to prove Esther's agency and agreement. The "direct instructions from the president"? Gorrín. The screenshots of texts with Delcy? Gorrín. "We need to get this to the Chancellor"? Rivera. "CRISIS=OPPORTUNITY . . ."? Gorrín. The seating chart for a meeting Esther did not attend? Rivera. Opp. 8–9, 15–16. The government strings these together and then, through the negatively-suggestive word "partners," attributes all of it to Esther. But a defendant is not convicted of what the people around her said. She is convicted for what she did, knew, agreed to, and intended. On those questions, the government's mosaic has a hole in the middle.

Our motion set out a chart of all fourteen witnesses and asked, for each, whether the witness offered any evidence that Esther entered an unlawful agreement, engaged in political activity, or acted with criminal intent. The answers were uniform. No. The government's twenty-five pages do not disturb a single one of those answers. The government meets each of our challenges the same way every time, not with Esther's words or Esther's intent, but with someone else's. That is the tell. When the strongest proof of a defendant's guilt is a co-defendant's text message, the case against her is not proof beyond a reasonable doubt.

## II.  The Government Did Not Prove That Esther Acted as a Foreign Agent or That She Acted Willfully.

The government had to prove two things about Esther that the record does not support: that she acted as an agent of a foreign principal, and that she did so willfully. Begin with willfulness,

4

the element that most plainly fails. Every FARA count required the government to prove that Esther acted with "the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law." *Bryan v. United States*, 524 U.S. 184, 190 (1998); DE 491 (jury instructions). That is the element on which the prosecution failed, and the government's attempt to fill the gap is the most revealing part of its brief.

The government's willfulness "evidence" fails. Start with reputation. The government says Esther skipped FARA registration to protect her standing in conservative Cuban-American Miami. Opp. 9–12. Look for the witness who said so. There is none. Perera testified that the partners wanted to keep the Venezuela relationship quiet, and we can accept that. Wanting privacy about a business relationship is a long way from deciding to evade a federal registration law. No witness tied Esther's reputation to FARA. No witness said Esther knew she had to register and chose not to. No witness said Esther ever looked at the legal requirements for FARA, asked about FARA, or weighed it against her reputation. The prosecutor told the jury that Esther "independently decided not to register because she was concerned about her reputation," but the prosecutor is not a witness, and no witness ever said it. The government invented a motive and asked the jury to convict on it. A motive the government made up is not proof of anything.

The reputation theory has a witness problem of its own. The political-exposure story came from Bertica Cabrera Morris. On direct, she told the jury that Esther skipped the Venezuela trip because Esther "was in the middle of running a campaign," and that if word got out "it would have hurt her." Tr. (Mar. 31) 102:8–11. Even then she hedged: "I just *think* she was working on a political campaign." Tr. (Mar. 31) 102:16 (emphasis added). On cross, the hedge became an admission. Asked whether she would "be surprised that [Esther] wasn't working on any campaigns in 2018," Cabrera Morris answered, "**I don't know**. That's what I thought she was doing." Tr.

(Mar. 31) 209:7–9 (emphasis added). So the campaign was the witness's incorrect assumption. And her own aside gave the game away: "I agree with that politically." Tr. (Mar. 31) 102:11. That is the witness adding her political read. Take away the assumption and the testimony shrinks to something innocent. Esther did not want to go to Venezuela. Tr. (Mar. 31) 209:14–16. That is the government's reputation proof at its strongest: a witness who guessed, and then admitted she guessed.

Familiarity with FARA is the government's other theme, and it proves just as little. What does "familiar with FARA" even mean here? The government's proof is that Esther pulled existing FARA filings off the DOJ website and borrowed their language for the purpose of the Interamerican contract's scope of services. Opp. 11–13. All that shows is that she knew the filings were there and used them as templates. Knowing that a public filing exists is a long way from knowing that your own background activity requires you to register, and the government treats the first as if it were the second. The February 2017 Ballard/Nuhfer text exchange is the same. The government holds it up as a warning Esther ignored. Read what she actually did. She encouraged Brian Ballard "to definitely register" with FARA to represent Lilian Tintori, and when Ballard urged her to "be extremely careful" about "the serious nature of the FARA laws," she answered "Absolutely." That conversation was about whether Ballard would represent Tintori and Leopoldo Lopez, and it had nothing to do with the PDV USA contract or her understanding that she needed to register with FARA for work David Rivera was performing. A person planning to flout FARA does not pass along an instruction to register and promise to be careful.

And here is what the familiarity theme misses entirely. Knowing that FARA *exists* was never the question. The question is whether Esther believed the law provided that any of her conduct required her to register, and the record answers it the same way for the other non-charged

individuals who were involved. None of them thought registration was required. The contract was with an American company. The work was a business deal, not politics. Perera believed exactly that: he testified he relied on Rivera's message and concluded he was not acting unlawfully, and the government does not quarrel with that testimony.  In fact, it agrees with Perera and did not charge him. Opp. 13–14. Similarly, Cabrera Morris believed the same about her own work for Gorrín under the Globovisión contract, and she said why in plain words: "the company I was representing was an American company," she "was not communicating with any government," and she was "trying to make a business deal." Tr. (Mar. 31) 212:6–12. Asked the bottom line, "So you didn't need to register?" she answered "No." Tr. (Mar. 31) 212:19–20. And Esther had the same understanding, from the same source, the former Congressman who told the group that the American-company structure did not trigger FARA. GX15 p.99; DRX 253 p.141. All the government proved is that Esther had heard of FARA. That was never what mattered. What mattered was whether she thought it applied to this deal, and on that she is no different from Perera or Cabrera Morris. None of them thought it did.

The government's own witness went much further than Esther ever did, and the government still saw nothing criminal in it. Cabrera Morris flew to Caracas on Gorrín's plane. She met Maduro face to face. She was paid for her work for Gorrín under the Globovisión contract. She never registered, and she never even considered it: "It didn't even cross my mind." Tr. (Mar. 31) 212:22. No one ever told her not to register, either. Tr. (Mar. 31) 212:25–213:1. So much for a conspiracy of concealment. The government did not charge her.  All the same facts are true for government witness Perera.

The government's attempt to single Esther out makes the point worse, not better. Its only distinction is that Perera "had never heard of FARA," while Esther was "intimately familiar" with

7

it. Opp. 13–14. But that cuts backward. A person who knows what FARA is, and who is then told by a former Congressman that this contract structure does not trigger it, has more reason to rely in good faith, not less. The government took a fact that supports good-faith reliance and, by assertion alone, turned it into proof of guilt.

Return to Esther's silence, because it shows the government's method better than anything else. After Rivera's October 5, 2017 message, Esther did not respond in writing. From that single fact, the government draws two inferences that point in opposite directions. First, that she did not rely on Rivera in good faith. Second, that her silence reflected a "desire to avoid any personally inculpatory discussion of FARA," Opp. 14 & n.8, meaning she was hiding a paper trail. Set aside that those two theories contradict each other. Ask what evidence supports either one. There is none. The government picks whichever reading hurts Esther and presents it as fact. That is backwards. The burden belonged to the government, and it tried this case in reverse: unable to show what Esther intended, it pointed to what the record does not contain and asked the jury to imagine the worst. "[W]here the government relies on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict." *United States v. Wenxia Man*, 891 F.3d 1253, 1265 (11th Cir. 2018) (alteration adopted) (quotations omitted). Imagining guilt from silence is the definition of speculation.

Now the conduct the government cannot explain: Esther walked away from roughly $35 million. Had the contract been assigned to PDVSA, which is what Venezuela, their alleged foreign principal, wanted, Interamerican would have collected about $35 million more, to be split with Esther. A person willing to break federal law for money does not leave that money on the table. Esther did. The government's only answer is a footnote saying there was "no direct evidence" that Esther opposed the assignment, and that the defendants kept seeking payment under the existing

contract. Opp. 14 n.8. That answer misses the point twice. The inference does not require that Esther blocked the assignment. It requires only what the record shows, that she never pushed for the deal that would have made her millions richer, which is the opposite of the greed the government sells. And Rivera kept seeking payment under a contract he had told others was legal. People who believe they are owed money under a lawful agreement do exactly that. There is nothing sinister in it.

GX29 makes the same point, and the government ignores it. Esther researched Gazprom out in the open. She posted public news links about it. She wrote, in plain words, "I see no problem with Gazprom." Is that how a person hides a crime? People who are hiding crimes do not post articles and announce that they see no problem. People who think they are doing lawful business do exactly that. The government's whole willfulness case runs on Esther's silence and on the words of other people. On the one question that mattered, what Esther herself intended, it has nothing. Zero.

Intent is not the only thing missing. The government spends six pages establishing that FARA's definitions are broad, broader, it says, than 18 U.S.C. § 951. Opp. 3–8. Set the breadth aside, because it does not matter here, for two separate reasons. First, broad or not, the definitions do not reach what Esther actually did. FARA reaches a person who acts as the agent of a foreign principal, at that principal's direction, and engages in political activity on its behalf. No foreign principal ever directed Esther to do anything. The "direct instructions from the president" the government likes to quote were Gorrín's words, in a chat, never sent to Esther by a Venezuelan government official. She never communicated with a Venezuelan foreign official, and the one the government called, Julio Borges, testified: "I do not know Esther Nuhfer other than what I have read in the press." Esther was David Rivera's business partner. That did not make her an agent of

Venezuela. Second, even if her conduct could be forced inside FARA's definitions, the statute still requires willfulness, and the government never proved it. Breadth fills neither hole. The thinness of the government's agency case against Esther is also why, at a minimum, this is a Rule 33 case. *See* Part IV.

That leaves the draft documents. First, Esther never drafted any of the documents that the government showcases, and there is no evidence that she did. At most she forwarded documents. But even if Esther drafted every one of them, so what? Drafting a document because your business partner asked you to is not acting as a foreign agent, and it is not engaging in political activity. Esther sent those drafts to Rivera and Gorrín. She never sent one to a foreign official, and she never sent one to a U.S. official. The letters that reached the State Department were sent by the Venezuelan ministry, not by Esther. Preparing an internal draft for your partner is not a crime, and it is not proof that Esther was anyone's agent or that she meant to break the law. The invoice the government features proves no more. Opp. 9. Billing for payment under a contract a former Congressman said was lawful shows she wanted to be paid.

The government's fallback, aiding and abetting, adds nothing. Opp. 16–18. By the government's own instruction, that theory required proof that Esther "intentionally join[ed]" Rivera "to commit a crime" and "intentionally associated with or participated in the crime." 11th Cir. PJI S7; 18 U.S.C. § 2. You cannot intentionally help commit a crime you do not know is being committed. Aiding and abetting rises and falls on the same intent the government never proved. It is the principal theory wearing a different hat, and it fails for the same reason. If anything, the government's reliance on it proves the point we develop in Part V: the case against Esther leaned so heavily on Rivera that the prosecution's last resort is to convict her for what **he** did.

### III.    The Money-Laundering Counts Fail for Want of Proceeds and for Want of an Agreement.

The money-laundering counts, Counts 3 and 6, fail for two independent reasons, and they fail before the Court even reaches the trial record, because they ride entirely on the FARA counts. If the government did not prove the underlying FARA crime, and it did not, then there are no "proceeds of a specified unlawful activity," and both the substantive count under § 1957 (Count 6) and the § 1956(h) conspiracy (Count 3) fall with it.

Even on their own terms, however, the counts fail, and the government's answer only shows that it misreads the governing law. As to Count 6, the purchase of the Key Colony Beach property, the funds were ordinary contract payments, paid under an agreement with an American company, with no shown connection to any decision about registration. The government tries to wave off *United States v. Christo*, 129 F.3d 578 (11th Cir. 1997), but it misreads the case. Opp. 19 n.10. *Christo* asks one question above all: were the funds "criminally derived" in the first place? Whether the financial transactions came "separately," or later in time, does not answer that question. A failure to register is a crime of omission, and an omission produces no revenue, no profit, no proceeds. Money paid under a contract is not the fruit of a later failure to file a form. The government's theory is a pure "but-for" fallacy: because the property purchase came after the registration failure, the funds must be tainted by it. That is the very reasoning *Christo* and *Kramer* reject. Both decisions require a causal link between the crime and the money, proceeds that the criminal activity itself produced. Coming later in time is not a causal link. *Christo*, 129 F.3d at 580; *United States v. Kramer*, 73 F.3d 1067, 1076 (11th Cir. 1996).

On Rule 29, that is a failure of proof. On Rule 33, it is worse for the government, because the Court weighs the evidence for itself. *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). The government answers that this Court already rejected the argument at the dismissal

stage. Opp. 19 n.10 (citing ECF 455 p.13). Putting aside that this is a different legal argument, the Court's pretrial ruling took the indictment's allegations as true. The trial is over, the allegations did not hold up, and Rule 33 is "not limited to cases where the district court concludes that its prior ruling . . . was legally erroneous." *Vicaria*, 12 F.3d at 198. The trial record, now complete, shows funds that were clean contract capital from an American company. The weight of that evidence will not support a money-laundering verdict.

Count 3 requires an agreement to launder, and the government still has not identified one. The government says our description of its theory "is simply inaccurate," but it never answers the defense challenge. Opp. 19–20 & n.11. It points to evidence that the contract proceeds were "divided amongst" the partners, and to Perera's testimony that there were "four partners." All of that shows how the money moved among the partners. None of it shows Esther agreeing with anyone to launder it. The government's actual § 1957 theory, as it confirmed at trial, is "the individual transactions that Esther engaged in to buy real property," a real-estate closing, with no evidence that anyone agreed with Esther to structure or conceal a thing. Buying a home with money you believe you earned lawfully is not a laundering conspiracy. There was no agreement to launder, because there was no laundering for anyone to agree to.

### IV. *Rafiekian* Governs the Rule 33 Analysis, and the Government's Distinctions Miss Its Point.

The government's attack on *Rafiekian* rests on two true premises that lead nowhere. Yes, *Rafiekian* was a § 951 case. And yes, the Fourth Circuit's decision does not bind this Court. Neither point touches the reason *Rafiekian* matters here.

Read *Rafiekian* for what it actually holds about Rule 33. The holding is about method, not about the elements of § 951. It provides that when the government's case is circumstantial, the district court must scrutinize the inferences itself, and that obligation does not change with the

statute charged. The Fourth Circuit held that where the prosecution must "weave a series of facially innocuous threads into a tapestry of unlawful conduct by inviting the jury to infer guilt," the district court sits as a thirteenth juror, examines those inferences for itself, and may find the innocent ones more persuasive. 68 F.4th at 189. And the line that matters most here: "The government is entitled to rely on circumstantial evidence, but it is not entitled to special deference when it does so." *Id.* at 190. That describes this case. The government's so-called proof of Esther's bad intent can only be reached by piling inference upon inference, and nothing more.

The government's mistake is to treat an argument about the substantive agency element as though it answered the Rule 33 standard. It does not. Whether FARA's agency definition is broader than § 951's tells this Court nothing about whether it may weigh competing inferences about Esther's intent. It may. And when it does, the government's own distinctions cut for Esther. The government stresses that Gorrín conveyed "direct instructions from the president," unlike Alptekin, the "wannabe emissary" in *Rafiekian*. Opp. 21. But those were Gorrín's words, in a chat. They were never instructions to Esther, who never communicated with a foreign official at all. The government stresses that Rafiekian, unlike Esther, "took steps . . . to properly register." Opp. 21. But that only underscores that the single registration discussion in this record told these defendants registration was not required. Every one of the government's distinctions is really about Rivera. None of them makes the case against Esther any stronger.

The Eleventh Circuit's own standard does not save the government either. If anything, it points the other way. The government quotes *Witt*: a new trial is proper in "the rare case in which the evidence of guilt although legally sufficient is thin and marked by uncertainties and discrepancies." *United States v. Witt*, 43 F.4th 1188, 1194 (11th Cir. 2022); *see United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985). That fits this case exactly. Thin: not one

witness against Esther. Inferential: Rivera's and Gorrín's words, borrowed. And missing the one thing every count requires, which is intent. This is the rare case. The government cannot cite a single decision, from any court, that upheld a foreign-agent conviction this attenuated as to one defendant over a Rule 33 motion. *Rafiekian* runs the other way, and it is persuasive precisely because the proof against Esther is weaker than the proof the Fourth Circuit refused to let stand.

### V.      The Spillover from Rivera Independently Requires a New Trial.

The government's response to the spillover problem is two footnotes, and both fail. Opp. 22–23 n.13.

First, the government says Esther "cannot be heard to complain" because her own counsel asked for the limiting instructions. That argument punishes diligence, and it misreads the point. Of course counsel asked the Court to tell the jury to disregard evidence admitted only against Rivera. That is what careful lawyers do. Asking for the instruction does not waive the argument that the instruction could not cure the prejudice. We are not complaining that the instructions were given. We are pointing out that the poisonous Rivera evidence – which was completely irrelevant to Esther – was so incurably prejudicial that **no** instruction could successfully convince a jury to disregard it and not place blame upon Esther. This point is the one the Supreme Court made in *Bruton*:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

*Bruton v. United States*, 391 U.S. 123, 135 (1968).

This is one of those contexts. For six weeks, the jury heard about a David Rivera who lied to the press, lied to colleagues, and, most damningly, lied under oath in three separate depositions. The structure of the indictment made it worse. Esther was charged in four counts. Rivera was

charged in ten of the indictment's eleven counts, including separate money-laundering counts that had nothing to do with Esther. So the jury sat through a mountain of evidence of Rivera's dishonesty and greed that would never have come in at a trial of Esther alone, and no number of repetitions of a limiting instruction could prevent that web of destructive evidence from being cast on Esther as well. If one alleged partner is a proven liar with a guilty conscience, the human mind fills in the rest: the other one must be guilty too. That is the inference the law forbids, and the inference this trial invited.

Second, the government argues there was no real prejudice because Esther deceived people too. The examples it provides are nonsensical and prove the opposite. The centerpiece is the Brakha episode, and the government concedes it is contested. Esther's own calendar (EN42), admitted without objection, indicates she was not there. The government rests on Brakha's recollection that Rivera "point[ed] at the lady next to him" and said "she signed" it, but the government did not even bother to ask Brakha to identify Esther in court or ask whether she might be the person who was with Rivera. Opp. 13. That is precisely the kind of thin, disputed inference Rule 33 lets this Court set aside, and it is a world away from three depositions of sworn perjury. The "progress report" and the Rubio "agenda" messages are ambiguous at worst, not confessions of a guilty mind. None of them comes close to the inflammatory force of Rivera's proven lies. Which is the whole point. The case the jury heard against Esther was, overwhelmingly, the case against Rivera.

Finally, the government has no answer on timing, so it gives none. This trial happened while Venezuela and the Maduro regime filled the front pages in Miami and feelings about that regime ran hot. A Miami jury was asked to judge a woman accused of secretly working for that regime, in that climate, next to a co-defendant the government cast as a serial liar. Rule 33 exists

15

for a moment exactly like this one, and *Vicaria* confirms that the Court may revisit its own prior rulings, including joinder, under Rule 33's broad interest-of-justice standard, on the record of the trial as it actually unfolded. 12 F.3d at 198.

## VI.    The Resolution Discussions.

One last point. By the government's own account, it was in discussions to resolve Esther's case in the middle of trial. Opp. 23 n.14. As we explained in our motion, those discussions included probation. The government's footnote says that it was not probation "only," but it does not deny that it was willing to resolve Esther's case short of incarceration. The Court may give the point whatever weight it deserves. What deserves the most weight is the trial record. And that record never proved Esther's guilt.


\* \* \*


16

**CONCLUSION**

| NAME | DO YOU KNOW ESTHER NUHFER? | DO YOU HAVE ANY EVIDENCE THAT ESTHER ENTERED INTO AN AGREEMENT TO COMMIT A CRIME? | DO YOU HAVE ANY EVIDENCE THAT ESTHER WAS LOBBYING OR DOING POLITICAL ACTIVITY? | DO YOU HAVE ANY EVIDENCE THAT ESTHER ACTED IN BAD FAITH OR WITH CRIMINAL INTENT? |
|---|---|---|---|---|
| 1. Gina Coon | NO | NO | NO | NO |
| 2. Marco Rubio | YES | No | No | NO |
| 3. John Butts | NO | NO | NO | NO |
| 4. Jeffrey Gilday | NO | NO | NO | NO |
| 5. Julio Borges | NO | NO | NO | NO |
| 6. Arnaldo Arcay | NO | NO | NO | NO |
| 7. Bertica Morris-Cabrera | YES | No | No | NO |
| 8. Brian Ballard | YES | NO | NO | NO |
| 9. Brian Naranjo | NO | No | No | NO |
| 10. Fernando Cutz | NO | NO | NO | NO |
| 11. Hugo Perera | YES | NO | NO | NO |
| 12. Javier Garcia | No | No | No | NO |
| 13. Joel Brakha | NO | No | NO | NO |
| 14. Mike Petron | NO | NO | NO | NO |

The government had six weeks, fourteen witnesses, and hundreds of exhibits. It used them to prove a case against David Rivera. It did not use them to prove that Esther Nuhfer agreed to violate FARA, acted as a foreign agent with criminal intent, agreed to launder money, or laundered the proceeds of a crime. No witness and no document established any of those things. The government's own cooperator said he never agreed to commit a crime with Esther. The government's own evidence—the only direct evidence of intent—showed that Esther relied on a former Congressman's assurance that the contract did not require registration, walked away from $35 million rather than do what Venezuela wanted, and said nothing at the only meeting she ever attended with a U.S. official.

Asked to point to one piece of evidence of Esther's guilty intent, the government gave the Court its three moves and nothing else. It guessed. It pointed to Rivera. And it dusted off a story the trial had already buried. A stack of inferences is not proof beyond a reasonable doubt, and the interests of justice do not permit a conviction built on one.

The Court should enter a judgment of acquittal under Rule 29 on all counts. If it does not, it should grant a new trial under Rule 33. The interests of justice require no less.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street, PH 1
Miami, FL 33128
Telephone: (305) 379-6667
Facsimile: (305) 379-6668

By:    /s/ David Oscar Markus
        David Oscar Markus
        dmarkus@markuslaw.com

        /s/ A. Margot Moss
        A. Margot Moss
        mmoss@markuslaw.com