**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20552-DAMIAN**

**UNITED STATES OF AMERICA**

**v.**

**ESTHER NUHFER,**

**Defendant.**
________________________________/

**PRELIMINARY ORDER OF FORFEITURE**

THIS MATTER is before the Court upon motion of the United States for entry of a Preliminary Order of Forfeiture ("Motion") against Defendant **ESTHER NUHFER** (the "Defendant"). The Court has considered the Motion, is otherwise advised in the premises, and finds as follows:

On November 16, 2022, a federal grand jury sitting in the Southern District of Florida returned an Indictment charging the Defendant Nuhfer in Count 1 with conspiracy to commit an offense against the United States, that is, failure to register as a foreign agent, in violation of 18 U.S.C. § 371 and 22 U.S.C. §§ 612(a), 618(a)(1), in Count 2 with failure to register as a foreign agent, in violation of 22 U.S.C. §§ 612(a) and 618(a)(1), in Count 3 with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and in Count 6 with engaging in transactions in criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. § 1957. *See* Indictment, Dkt. No. 3.

The Indictment also contained forfeiture allegations, which provided that upon conviction of a violation of, or conspiracy to violate, 22 U.S.C. §§ 612(a) and 618(a)(1), Defendant Nuhfer shall forfeit to the United States any property, real or personal, which constitutes or is derived from

proceeds traceable to such offense, pursuant to 18 U.S.C. § 981(a)(1)(C). *See id.* at 31. The forfeiture allegations also provided that upon conviction of a violation of 18 U.S.C. §§ 1956 and/or 1957, Defendant Nuhfer shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1). *See id.* The forfeiture allegations section also specifically listed certain assets subject to forfeiture. *See id*. at 31–32.

On December 14, 2023, a federal grand jury sitting in the Southern District of Florida returned a Superseding Indictment, maintaining the same charges as in the Indictment, but also adding tax charges against Co-Defendant David Rivera.[1] *See* Superseding Indictment, Dkt. No. 122. The Superseding Indictment also maintained the same forfeiture allegations as in the Indictment. *See id*. at 38–40.

The forfeiture allegations listed the following five specific assets alleged to be subject to forfeiture as directly forfeitable assets pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1):

(a) Wells Fargo account no. 6423-2614, held in the name of Esther Nuhfer;

(b) Real property located at 2665 S.W. 37th Avenue, Unit 504, Miami, Florida 33133;

(c) Real property located at 1673 Pink Dogwood Way, Oviedo, Florida 32765;

(d) Real Property located at 21 Sadowski Causeway, Key Colony Beach, Florida 33051;

(e) Real property located at 10925 N.W. 43rd Lane, Doral, Florida 33178.

*See id*. at 39–40.

On March 22, 2026, the United States filed an Amended Bill of Particulars, giving notice that, in addition to the property generally and specifically identified in the forfeiture allegations of

[1]Tax-related charges have since been severed. *See* Order, Dkt. No. 325.

the Superseding Indictment, the United States seeks the forfeiture of the following property as directly forfeitable assets, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1):

(a) Real property located at 3663 S. Atlantic Avenue, Unit 20C, New Smyrna Beach, Florida 32169;

(b) Real property located at 9425 S.W. 38th Street, Miami, Florida 33165; and

(c) Real property located at 82 Tingler Lane, Marathon, Florida 33050.

*See* Amend. Bill of Particulars, Dkt. No. 422; *see also* Bill of Particulars, Dkt. No. 123.[2]

On March 23, 2026, the case proceeded to trial. *See* Trial Minute Entries, Dkt. Nos. 424–428, 430–433, 435–436, 444–445, 447–449, 454, 456–457, 462, 480–481, 483.

On May 1, 2026, the petit jury empaneled in this case returned its Verdict [Dkt. No. 489] in which it found Defendant Nuhfer guilty of the violations charged in **Count 1** (conspiracy to violate 22 U.S.C. §§ 612(a) and 618(a)(1), in violation of 18 U.S.C. § 371), **Count 2** (failure to register as a foreign agent in violation of 22 U.S.C. §§ 612(a) and 618(a)(1)), **Count 3** (conspiracy to violate 18 U.S.C. § 1957 in violation of 18 U.S.C. § 1956(h)), and **Count 6** (money laundering, in violation of 18 U.S.C. § 1957). *See* Trial Minute Entry, Dkt. No. 487; Jury Verdict, Dkt. No. 489.

Continuing on May 1, 2026, upon Defendant Nuhfer's request to retain the jury to determine whether the requisite forfeiture nexus exists for specific property the Government sought to forfeit, the Court conducted a bifurcated forfeiture proceeding pursuant to Fed. R. Crim. P. 32.2(b)(1)(A) and (b)(5)(A) immediately following its announcement of the Verdict. *See* Trial Minute Entry, Dkt. No. 487.

---

[2] The Amended Bill of Particulars filed at Dkt. No. 422 revised the asset descriptions for certain real properties, which had previously identified specific sums of money to be preserved in place of forfeiting the corresponding real property.

Upon conclusion of that bifurcated forfeiture proceeding and subsequent deliberation, the same petit jury returned a Forfeiture Verdict, unanimously finding that the Government proved by a preponderance of the evidence that the real property located at 21 Sadowski Causeway, Key Colony Beach, Florida 33051 was involved in the money laundering offense charged in Count 6. *See* Special Verdict, Dkt. No. 490.

As established at trial, from February 2017 through December 2018, Defendant Nuhfer conspired with Defendant Rivera to unlawfully enrich themselves by covertly representing Nicolas Maduro's Venezuelan government to influence U.S. foreign policy in violation of the Foreign Agents Registration Act ("FARA"). As the Government established at trial, and as credited by the jury in finding Defendant Nuhfer guilty in Counts 1 and 2 of the Superseding Indictment, Defendant Nuhfer and Defendant Rivera effectuated their scheme through a lucrative contract, totaling $50 million, nominally executed between Defendant Rivera's company, Interamerican Consulting ("Interamerican"), and PDV USA, Inc. ("PDV USA"), a U.S.-based subsidiary of Venezuela's state-owned oil company, PDVSA—thereby cloaking their unregistered lobbying activities. *See* Superseding Indictment, Dkt. No. 122; Jury Verdict, Dkt. Nos. 488, 489. Moreover, as established at trial, Defendant Nuhfer also conspired with Defendant Rivera, in Count 3, to divide the illicit proceeds derived from that conspiracy. Indeed, the trial record is replete with evidence showcasing Defendant Nuhfer's efforts in furtherance of the FARA conspiracy, for which she was ultimately paid millions.

**A. Defendant Nuhfer's Involvement in the FARA-Scheme.**

The jury heard testimony from one of Defendant Nuhfer's partners, Huge Perera, who stated that he introduced Defendant Nuhfer to Raul Gorrin, after Defendant Nuhfer expressed an interest in meeting wealthy Latin Americans in order to obtain referral fees for U.S. lobbying

engagements. *See* April 7th Tr. (Perera) at pp. 58–62. Thereafter, Defendant Nuhfer introduced Defendant Rivera to Perera and Gorrin. *See id.* at pp. 8. From there, Defendant Rivera's and Defendant Nuhfer's scheme to trade convert influence for cash was off and running.

First, Gorrin was able to assist in getting this extraordinary contract "[b]ecause he was a close friend of Delcy Rodriguez and . . . Nicolas Maduro," *id.* at p. 86, while Defendant Rivera's and Defendant Nuhfer's contributions to the partnership included their political relations and contacts in the United States, *id.* at pp. 125–126. As Perera testified, Gorrin conveyed that the $50 million contract was for work on behalf of Venezuela's government, and the partners "discuss[ed] the possibility of in fact working on behalf of the regime." *Id.* at pp. 91–92. Perera further related the four partners' understanding that "Raul [Gorrin] was getting the contract so that relations between Venezuela and the U.S. could be improved." *See* April 7th Tr. (Perera) at p. 96; *see also id.* at p. 91 (describing Maduro's desire for the contract "to improve the [U.S.-Venezuela] relationship"). Second, Consistent with that understanding, Defendant Nuhfer used FARA filings for foreign-government lobbying engagements to draft the services description for the contract under which she and her partners would be getting paid. *See* GX[3] 133 at p. 6; GXs 326, 328.

In furtherance of the FARA-scheme, the $50 million agreement was formally between Defendant Rivera's company Interamerican and PDV USA—concealing that the true clients were Venezuelan Minister Delcy Rodriguez and President Nicolas Maduro, and ultimately the Venezuelan Government. *See* April 7th Tr. (Perera) at pp. 94–95 ("Q. . . . [I]s there any doubt in

[3] The Government's Trial Exhibits ("GX") are filed at Dkt. Nos. 523–28. Attached to this motion are some exhibits used to calculate the money judgment and support forfeiture involved in Court 6 of the Superseding Indictment. *See* Fed. R. Crim. P. 32.2(b)(1)(B) ("The court's determination [on forfeiture] may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.").

your mind that your client and your partners' client was the government of Venezuela? A. No."). Moreover, the evidence established at trial showed that the Venezuelan Government directed executives of CITGO oil company to enter into the three-month, $50 million contract with Interamerican Consulting, which called for five installment payments of $5 million each and a final payment of $25 million. *See* Mar. 23rd Tr. (Gina Coon) at pp. 166 to 170.

In furtherance of the $50 million contract, and throughout the charged scheme, Defendant Nuhfer engaged in conduct that required registration under FARA. For example, the jury learned that shortly after Defendant Rivera signed the $50 million agreement on March 21, 2017, Defendant Nuhfer acted as "the glue," organizing April 1–2, 2017, meetings in New York between U.S. Representative Pete Sessions, Delcy Rodríguez, and opposition figure Julio Borges. *See* Mar. 30th Tr. (Bertica Cabrera Morris) at pp. 48, 60. Bertica Cabrera Morris testified that "[Defendant Nuhfer's] the one that knew some of the folks that did the introduction to [Defendant Rivera]. And she came with us to New York," and confirming that Defendant Rivera, Defendant Nuhfer, Gorrin, and Perera "were the team that was working on this effort." *See id*. As part of these coordination efforts, as the jury further learned, Defendant Nuhfer transmitted draft correspondence addressed from Delcy Rodriguez to U.S. Secretary of State Rex Tillerson concerning Gorrin's appointment by Venezuela "as an emissary and in coordination with [Rep.] Sessions to engage in discussions with the United States Government in furtherance of normalizing the [U.S.-Venezuela] relationship." *See* GX 15 at p. 32.

In another example, trial evidence established that Defendant Nuhfer coordinated and attended a July 12, 2017, meeting in Washington, D.C., with U.S. Senator Marco Rubio, Gorrin, and opposition figure Henry Ramos Allup. *See* GX 15 at pp. 76–82; GX 345 (Rivera-Nuhfer email on New York itinerary); GX 17 at p. 1 (Rivera-Borges text, "Esther is sending you Pete's [Rep.

Sessions] information"); GX 15 at pp. 20–33 (texts in the MIA Chat reflecting Nuhfer's role in setting up the meeting and her understanding of its political context). At that time, the FARA-scheme participants' strategy for normalizing U.S.-Venezuela relations centered on a potential reconciliation framed around "postponing" the Maduro regime's plan to institute a sham, U.S.-opposed legislative body known as the "Constituent Assembly." *See* GX 15 at p. 78. Defendant Nuhfer was fully aware of the political context surrounding the July 12 meeting through the MIA Chat Group, where the participants discussed "postponing" rather than "canceling" the Constituent Assembly just the day before. *See id*. Notably, Defendant Nuhfer explicitly discussed concealing the meeting's true objective from outside scrutiny, cautioning: "So that we are all on the same page, in the event they see us in DC together…The agenda of the DC trip will be Henry Allup meeting with members of the international press. 😉" *See id*. at p. 77.

Further, as the Government established at trial, Defendant Nuhfer emailed Gorrin (and Defendant Rivera), on March 23, 2018, a draft letter of invitation she had prepared from Venezuelan Foreign Minister Jorge Arreaza to acting U.S. Secretary of State John Sullivan, requesting that U.S. Representative Pete Sessions travel to Venezuela to meet with President Nicolás Maduro. *See* GX 463. Defendant Nuhfer was fully aware of Gorrin's connections to Maduro and his role as a close confidant to Venezuelan Minister Delcy Rodriguez, having received direct instructions from Maduro and screenshots of texts with Delcy inside the "MIA Chat Group"—a forum she created and actively used in 2017 to coordinate the FARA scheme. *See* GX 15 at pp. 1, 9, 36.

On the very same day Defendant Nuhfer transmitted her draft, the official Venezuelan Foreign Ministry issued an invitation to U.S. Secretary Sullivan featuring text *identical* to Defendant Nuhfer's draft. *See* GX 200B; Apr. 1st Tr. (Brian Naranjo) at pp. 31–32. Then, less than

two weeks later, Rep. Sessions traveled to Venezuela with Defendant Rivera to meet with Maduro, where they discussed U.S.-Venezuela relations, including Maduro's potential exit from office free from prosecution and safe passage for his family. *See* Apr. 27th Tr. (Rep. Sessions) at pp. 62–63. Defendant Nuhfer, who at that point had been paid millions in furtherance of the FARA-scheme (*See* GXs 1, 9C), monitored the trip's progress (GX 256) through Bertica, remaining absent from the trip only because she was managing a political campaign in South Florida and feared the negative public fallout if her presence in Venezuela became known. *See* Mar. 30th *Tr.* (Bertica) at p. 112.

**B. The FARA-Scheme Generated $20 million in Illicit Proceeds, which were then Laundered in part to Defendant Nuhfer.**

Testimony and documentary evidence at trial established that Defendant Rivera's and Defendant Nuhfer's FARA scheme generated $20 million in proceeds. The jury heard from Mike Petron—a forensic accountant employed by Stout and working for the Department of Justice—who testified that he and his team reviewed voluminous banking records and prepared summary charts documenting the flow of funds from bank accounts ultimately controlled by the Venezuelan Government to Defendant Rivera and beyond. *See* GX 1 (summarizing GXs 710–738, 770–780). Bank records and Mr. Petron's testimony further established that Defendant Rivera systematically distributed the funds received from PDV USA and PDVSA in accordance with the agreement made between him, Defendant Nuhfer, Parera, and Gorrin,[4] distributing approximately 75% of the $20 million to his partners, including Defendant Nuhfer who received a net total of $4,691,333.

[4] Perera testified that there were "four partners" in the charged scheme (himself, Gorrin, Rivera, and Nuhfer), and described his discussions with Rivera and Nuhfer "about how [they] were going to split the money" from the $50 million contract—including defendants' understanding that they would be getting "25 percent each." Apr. 7th Tr. (Perera) at pp. 97–98 ("Q. How do you know that? A. Because we spoke about it several times.").

*See* GXs 1, 9A, 9B, 9C, 9D; *see also* GXs 710–738, 770–780. This agreement and ultimate transfer of those illicit FARA proceeds served as the basis for Count 3, which the jury found Defendant Nuhfer guilty of participating in.[5] *See* Verdict.

Specifically, Defendant Rivera, through his company Interamerican Consulting, received three of the installment payments, on March 24, April 10, and April 19, 2017, for $5 million each, totaling $15 million, from bank accounts controlled by CITGO and PDV USA—the first payment coming days after executing the $50 million contract. *See* GXs 1, 9A; *see also* GXs 700, 701, 710–738, 749–752. And, on October 27, 2017, evidence showed that Interamerican received a wire transfer in the amount of $5 million from a PDVSA account held at Gazprom Bank in Russia. *See* GX 9A; *see also* GXs 710–722. Notably, the payment from the Russian bank came after CITGO executives in the U.S. refused to make any additional payments under the Interamerican's "consulting" contract. *See* Mar. 23rd Tr. (Coon) at 202–218.

The trial evidence also established that shortly after Interamerican's bank account received each tranche of funds from PDV USA and PDVSA, Defendant Rivera transferred a portion of such funds directly to bank accounts held by Communication Solutions, an entity solely owned and controlled by Defendant Nuhfer, totaling a gross total of $7,191,000. *See* GX 1, GX 9A, 9C, GXs 710–738; Apr. 17th Tr. (Petron) 136–145 (detailing the four $5 million wire transfers, totaling $20 million). According to bank records and Mr. Petron's testimony, Communication Solutions subsequently returned $2,500,000 to Interamerican, leaving approximately $4,691,333 in net PDV USA/PDVSA proceeds personally obtained and retained by Defendant Nuhfer. *See* GXs 1, 9C (summarizing GXs 723–747, 770–774).

---

[5] *See* Gov't Op. to Def. Nuhfer's Mot. for Acquittal and For New Trial 18–20, Dkt. No. 550 (setting forth evidence admitted at trial supporting Defendant Nuhfer's convictions in Counts 3 and 6).

Accordingly, based on the record in this case, the total value of property constituting or derived from proceeds traceable to Defendant Nuhfer's conviction in Count 1 and Count 2 and subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) is $4,691,333 in United States currency, which sum may be sought as a forfeiture money judgment pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

Additionally, also based on the record in this case, the total value of property involved in the money laundering conspiracy offense of conviction (Count 3), and subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1), is $15 million in United States currency, which sum may be sought as a forfeiture money judgment pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure. *See supra* §A & B. As mentioned above, however, the record in this case shows that Defendant Nuhfer obtained $4,691,333 of the $15 million involved in Count 3. Although the rule barring joint and several forfeiture money judgment liability set forth in *Honeycutt* (*see supra* §B, pp. 7–8) does not apply to money laundering charges (*see Waked Hatum*, 969 F.3d at 1165), the Government believes, based on the record in this case, a forfeiture money judgment of $4,691,333 is more appropriate.

**C. In a Bifurcated Forfeiture Proceeding, the Jury Finds the Requisite Forfeiture Nexus Exists Between the Defendant Nuhfer's Real Property and Count 6.**

The Jury also found Defendant Nuhfer guilty of Count 6 of the Superseding Indictment, which alleged that she used more than $10,000 in illicit FARA proceeds to purchase the real property located at 21 Sadowski Causeway, Key Colony Beach, Florida, in violation of 18 U.S.C. § 1957. *See* Superseding Indictment 30; Verdict, Dkt. No. 489. By way of their guilty verdict, the Jury necessarily credited Mr. Petron's testimony and analysis of the relevant bank records, which showed that the charged financial transaction to purchase the property included $441,882 in PDV USA/PDVSA derived funds.

Specifically, as compiled and summarized by Mr. Petron in his summary charts for Count 6 (GX 4) and Net Flows of Funds from PDV USA and PDVSA (GX 1), Defendant Rivera, through Interamerican's bank accounts, paid Defendant Nuhfer a net total of $4,691,333 of the $20 million paid by the Venezuelan Government. *See* Gx 1 (summarizing GXs 710-738, 770-780); GX 4 (summarizing GXs 702-722, 733-747, and 761-769A).[6]

As is relevant to Count 6, Mr. Petron testified that his analysis starts with $15 million from PDV USA to Interamerican's bank account JPMC Acct. 1682, and FARA proceeds moving to, from, and among three bank accounts held in the name of Communications Solutions and controlled by Defendant Nuhfer (*i.e.*, JPMC Acct. 1389, JPMC Acct. 8305, and Wells Fargo Acct. 3419). *See* Apr. 17th Tr. (Petron) at pp. 155–157; GX 4. Mr. Petron testified that analysis of the bank records showed that Defendant Nuhfer routed approximately $943,000 of PDV USA derived funds through Communication Solutions' three bank accounts to Wells Fargo Acct. 3419, and $441,882 in PDV USA derived funds directly funded the purchase of 21 Sadowski Causeway, Key Colony Beach, Florida. *See* Apr. 17th Tr. (Petron) at pp. 155–159; GXs 4, 702–722, 733–747, and 761–769A.

After finding Defendant Nuhfer guilty of using criminal derived proceeds to purchase the property located at 21 Sadowski Causeway, Key Colony Beach, Florida (Count 6 of the Superseding Indictment), and upon request by Defendant Nuhfer, the jury returned a forfeiture verdict specifically finding that the property was "involved in the offense charged in Count 6 [ ], or is traceable to such property." *See* Forfeiture Verdict, Dkt. No. 490.

[6]GXs 702–709 (bank records for Communication Solutions JPMC Acct. 1389); GXs 710–722 (Interamerican JPMC Acct. 1682); GXs 733–738 (Interamerican JPMC Acct. 5336); GXs 739–747 (Communication Solutions JPMC Acct. 8305); GXs 761–768 (Communication Solutions Wells Fargo Acct. 3419); and GXs 769 and 769A (Wolfe Stevens PLLC Records).

Accordingly, in addition to the above, also based on the record in this case and the Jury's forfeiture verdict, the following specific property is directly subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(1):

> Real property located at 21 Sadowski Causeway, Key Colony Beach, Florida 33051, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,
>
> Also Known As: The Southerly half of Lot 14, MARINA SUBDIVISION, PLAT NO. 2, according to the Plat thereof, as recorded in Plat Book 4, Page 53, of the Public Records of Monroe County, Florida.
>
> AND
>
> The Southerly half of a three-foot strip of land and baybottom lying immediately Easterly of and contiguous to the Easterly lot line of Lot 14, MARINA SUBDIVISION PLAT NO. 2 according to the plat thereof as recorded in Plat Book 4, Page 53 of the Public Records of Monroe County, Florida and being more particularly described by metes and bounds as follows: Commencing at the Northeast corner of Lot 14, MARINA SUBDIVISION Plat No. 2, bear Easterly along the projection of the Northerly lot line of said Lot 14 a distance of 3 feet; thence at right angles to the last courses line and South for a distance of 40 feet to a point; thence West for a distance of 3 feet to the Southeast corner of said Lot 14; thence Northerly 40 feet back to the point of beginning.

Accordingly, based on the foregoing, the evidence in the record, and for good cause shown, the Motion is **GRANTED**, and it is hereby **ORDERED** that:

1. Pursuant to 18 U.S.C. § 981(a)(1)(C) and Rule 32.2 of the Federal Rules of Criminal Procedure, a forfeiture money judgment in the amount of $4,691,333 in United States currency is hereby entered against the Defendant.

2. In addition, pursuant to 18 U.S.C. § 982(a)(1) and Rule 32.2 of the Federal Rules of Criminal Procedure, a forfeiture money judgment in the amount of $4,691,333 in United States currency is hereby entered against the Defendant, to be subsumed with the forfeiture money judgment ordered above.

3. Pursuant to 18 U.S.C. § 982(a)(1), the following specific property is hereby forfeited and vested in the United States of America:

i. Real property located at 21 Sadowski Causeway, Key Colony Beach, Florida 33051, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,

Also Known As: The Southerly half of Lot 14, MARINA SUBDIVISION, PLAT NO. 2, according to the Plat thereof, as recorded in Plat Book 4, Page 53, of the Public Records of Monroe County, Florida.

AND

The Southerly half of a three-foot strip of land and baybottom lying immediately Easterly of and contiguous to the Easterly lot line of Lot 14, MARINA SUBDIVISION PLAT NO. 2 according to the plat thereof as recorded in Plat Book 4, Page 53 of the Public Records of Monroe County, Florida and being more particularly described by metes and bounds as follows: Commencing at the Northeast corner of Lot 14, MARINA SUBDIVISION Plat No. 2, bear Easterly along the projection of the Northerly lot line of said Lot 14 a distance of 3 feet; thence at right angles to the last courses line and South for a distance of 40 feet to a point; thence West for a distance of 3 feet to the Southeast corner of said Lot 14; thence Northerly 40 feet back to the point of beginning.

4. Any duly authorized law enforcement agency may seize and take possession of the forfeited property according to law.

5. Pursuant to 21 U.S.C. § 853(g), no party other than the United States may sell, alienate, alter title, or otherwise dispose of the forfeited property absent further Court order.

6. Also pursuant to 21 U.S.C. § 853(g), the United States is further authorized to inspect the real property listed in this Order. The inspection should, among other things, enable the United States to appraise the condition and value of the real property, and permit the United States to take inventory of fixtures on the real property, including the use of still and video photography of the premises.

7. The United States shall send and publish notice of the forfeiture in accordance with Rule 32.2(b)(6) of the Federal Rules of Criminal Procedure and 21 U.S.C. § 853(n).

8. If, however, pursuant to 28 U.S.C. § 524(c)(1)(D) and 28 CFR § 0.111(i), the United States intends to pay valid liens on forfeited property in full, then the United States is not required to send notice to those lienholders.

9. The United States is authorized to conduct any discovery that might be necessary to identify, locate, or dispose of forfeited property, and to resolve any third-party petition, pursuant to Rule 32.2(b)(3), (c)(1)(B) of the Federal Rules of Criminal Procedure and 21 U.S.C. § 853(m).

10. Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Order is final as to the Defendant.

11. The Court shall retain jurisdiction in this matter for the purpose of enforcing this Order, and pursuant to Rule 32.2(e)(1) of the Federal Rules of Criminal Procedure, shall amend this Order, or enter other orders as necessary, to forfeit additional specific property when identified.

**DONE AND ORDERED** in Miami, Florida, this _______ day of August 2026.

______________________________________

HON. MELISSA DAMIAN
UNITED STATES DISTRICT JUDGE